UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

CANDACE CARTAGENA,

                                        Petitioner,                    DECISION AND ORDER

-vs-
                                                                        18-CV-6595 (CJS)
SUPERINTENDENT LAMANNA,

                                        Respondent.

———————————————————————————

Petitioner Candace Cartagena ("Cartagena") filed *pro se* the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge her conviction and sentence after a non-jury trial in County Court in Erie County, New York for murder in the second degree. Pet., Aug. 16, 2018, ECF No. 1. She maintains the state appellate court violated her due process rights, that the state trial court violated her Fifth Amendment rights, and that she received ineffective assistance of trial counsel. Respondent Superintendent Lamanna opposes the petition. Mem. in Supp., Nov. 19, 2018, ECF No. 5. For the reasons discussed below, Cartagena's petition [ECF No. 1] is denied. The Clerk of Court is directed to close this case.

BACKGROUND

Factual Background

Cartagena was charged with second degree murder in connection with the death of her eight-year old daughter, Bianca, on or about November 29, 2010. After a full bench trial, the state trial court issued a "Findings of Fact [and] Verdict" that recited the following factual background:

> The defendant's mother, Kathleen Sweeney testified that she had dropped Bianca off at the defendant's house at around 2:15 p.m. on Monday, November 29, 2010. She described Bianca as a healthy, lively eight-year old girl who exhibited no signs of ill health or physical injury. The plan was for Bianca to spend some time with her mother before leaving with her father, Ruben Cartagena and his family for Disney World. Mrs. Sweeney was going to pick Bianca up around 5:00 p.m. and take her to gymnastics. Earlier that morning, at around 7:35 a.m., the defendant had texted her mother asking to come along so they could chat outside of Bianca's presence . . . .

1

Shortly before 3:00 p.m., the defendant texted her mother that Bianca "wants to skip gymnastics and go to Dave and Buster's." She explained that Stacey Reeves (the defendant's friend), had promised to take Bianca there for her birthday so they all were going to go there that evening (after Stacey got out of work), and then bring her home to her grandmother's (where Bianca had been living for the past few months while the defendant dealt with her personal problems and tried to get her life back on track).

At around 4:00 p.m., the defendant informed her mother that she should come pick up Bianca for gymnastics because Bianca had displayed an "awful attitude" during homework and she did not see fit to reward her with a trip to Dave and Buster's. Fifteen minutes later, however, she wrote, "(n)evermind ... wer (sic) going with Stacey ... she will be home around 8:30." At 7:22 p.m., the defendant texted "we will be back closer to 9." At 8:49 p.m., she texted, "Bianca is passed out ... Im gonna keep her here with me 2nite ... Im off ... Stacey bought her a new outfit at the mall(sic) and wer (sic) stopping at Wilson Farms for lunch stuff." When her mother asked her why she was off from work (thinking she'd used up all her time), the defendant replied at 8:45 p.m., "(f)loating holiday ... its fine shes asleep and I got my rental so I'll take her to school." (Most of these messages had been deleted from the defendant's phone).

Stacey Reeves (who had lived with the defendant and Bianca through July, 2010), testified that she had no plans to take the defendant and Bianca to Dave and Buster's on November 29, 2010. In fact, Stacey and the defendant exchanged multiple text messages in which the defendant promised to stop by that day and pay her back the money she had spent on their night out after a Sabres game the previous Wednesday. At 2:00 p.m., the defendant stated that they would meet later because Bianca had gymnastics and she had an appointment with a shrink. At 6:00 p.m., the defendant, sounding coherent, promised to come by at 10:00 p.m. but never did. (Text messages to Stacey on November 29th and 30th were deleted from the defendant's phone as well).

At 6:35 a.m the next morning, the defendant texted her mother that they were "just waking up" and that she would pick Bianca up at school and bring her home by 6:00 p.m." At 7:06 a.m., her mother asked to "(h)ave Bianca call me." Several hours later at 12:19 p,m, her mother asked, "(h)ow did Bianca do going to school?' At 12:20 p.m., the defendant replied, "ok." A few minutes later, her mother said, "(g)reat see you at 6." At 2:24 p.m., the defendant texted, "will bring her by 7." Three hours later at 5:17 p.m., her mother inquired, "(w)here is Bianca? She wasn't in school, why?" At 5:50 p.m., the defendant texted, "(w)e spent the day together at strong museum ... on our way back now." (Police review of surveillance camera footage at Strong Museum on November 30th and Dave and Buster's on November 29th, 2010 showed no sign of the defendant or Bianca).

At 7:40 p.m., the defendant's mother wrote, "okay it is after 7 and we have things to do for her trip, where are you?" At 8:00 p.m., she inquired, "where are you?" and at 8:36 p.m., "(w)hat are you doing?"

Findings of Fact [and] Verdict, 4–6, Jul. 21, 2014.

Cartagena stopped responding to her mother's text messages, so Cartagena's step-father,

Bryan Sweeney, met Cartagena's sister, Casie Lamarca, at Cartagena's house just before 9:00 p.m.

on Tuesday, November 30, 2010. The trial court further found that:

> [Sweeney discovered] Bianca in her mother's darkened bedroom completely covered
> by a top sheet. After pulling it down, he saw Bianca lying on her back with her right
> arm extended upward and her left arm resting across her lower abdomen at the waist
> . . . He felt that her body was rigid and cold. Her t-shirt was pulled up to her chest and
> one foot was barefoot and the other was half covered by a sock that appears to have
> been pulled down . . . The bedding was in disarray with the bottom fitted sheet pulled
> up (revealing the mattress), pillows were askew on the bed (one with its case partially
> off) and one pillow was on the floor on the left side of the bed along with a child's
> backpack and sneakers. The other sock was on the right side floor next to the bed
> below the body.
>
> Sweeney and [Lamarca had] gained entry into the locked and darkened house with
> the aid of Sweeney's crow bar. They observed Bianca's coat on the downstairs
> banister and saw that the house had been stripped of cabinets, appliances and
> fixtures. There was feces and vomit (stipulated to be the defendant's) at various
> locations and the defendant's two dogs were upstairs yapping. The bedroom doors
> were all closed and very few lights could be turned on. The defendant was not in the
> house but was later found by police in the backyard in a shed dressed in a winter coat,
> pants and sneakers, covered in blankets and carpet remnants under some pallets
> perched against a shelf.
>
> Police also found a large bottle of Ibuprofen and a container of Arizona iced tea. There
> was vomit on the floor. Several other bottles of pills were also found in the house.
> While the defendant initially appeared to be moaning and unresponsive, her eyes were
> twitching beneath her closed lids in response to light and her arms exhibited control
> (in response to a gravity test) which led the EMT (Dan Snyder) to conclude that she
> was feigning unconsciousness. In the ambulance, she was responsive (both to the
> EMT and to Officer Mark Doldan) to questions about her situation and pedigree.
> Specifically, when asked what pills she had taken, she rattled off a long menu of
> medications including Ibuprofen, Celexa, Metformen (which she spelled), Benadryl,
> Claritin and Tylenol. Office Doldan described her as being in decent condition, and her
> trip to ECMC was deemed by the EMT to be a non-emergency.

Findings of Fact [and] Verdict at 2–4. Notwithstanding the irregularities surrounding Bianca's death,

Cartagena was not arrested following her hospitalization. Instead, she was admitted for psychiatric

treatment at the Erie County Medical Center ("ECMC"), and released after a couple of months. In

May of 2013, however, Cartagena was charged with the murder of Bianca. She proceeded to a non-

jury trial in June 2014.

It was undisputed at trial that Bianca died at her mother's home, in the exclusive company of her mother. Between December 2010 and her arrest in May 2013, Cartagena consistently denied knowledge of how Bianca died, and testimony offered at trial showed she had given a number of different accounts to police, boyfriends, friends, and family members. For instance, Officer Mark Doldan of the Amherst Police Department accompanied Cartagena in the ambulance to ECMC from her home on the evening of Bianca's death. Trial Tr. vol. II, 295:3–4, June 10, 2014. At the hospital, Officer Doldan had a conversation with Cartagena to gather pedigree information to complete his initial police report. Trial Tr. at 296:16–17. In addition to such information as her name, date of birth, and phone number, Officer Doldan asked Cartagena if she had any other family members and Cartagena mentioned Bianca. Trial Tr. at 302:6–9. When he asked where Bianca was, Cartagena told him that Cartagena's mother had picked Bianca up at 5 p.m. that day to take her to gymnastics, and that by then Bianca was at her parents' house. Trial Tr. at 302:13, 304:17–18. When Officer Doldan asked what she remembered of that night, Cartagena responded that she remembers taking pills and lying down. Trial Tr. 305:20–21. Officer Doldan was relieved at the hospital by Detective Solak, who learned from Cartagena that she had started taking pills twenty-four hours before her hospitalization. Trial Tr. at 335:13–20. Cartagena also told Detective Solak that Bianca was with Cartagena's mother. Trial Tr. at 336:12–14. Detective Lieutenant Richard Walter also visited Cartagena in the hospital, both to notify Cartagena that Bianca was deceased and to execute a search warrant. Trial Tr. at 398:9–12. Despite her earlier expressions of belief that Bianca was with her mom, when Detective Walter informed Cartagena that Bianca was dead, "[s]he showed no emotion . . . . she didn't show any physical response, outward physical response whatsoever." Trial Tr. at 404:2–7.

Further, while undergoing psychiatric treatment at ECMC, Cartagena became involved with a man named Avery Ray, and moved in with Ray upon her release from treatment. Ray testified that he didn't talk about Bianca's death with Cartagena too much because he was trying to keep things

positive, but Cartagena did tell him that the "last thing she remembers is putting Bianca to bed and she woke up overdosing pills, [and] that's as far as . . . she could remember." Trial Tr. vol. IV, 662:9–14, June 12, 2014. Ray's brother, Raison Holt, on the other hand, testified that one evening Cartagena was driving him to his girlfriend's house and "out of nowhere she just blurted, I didn't mean to hurt Bianca." Trial Tr. vol. III, 599:20–21, June 11, 2014. Several months later, Cartagena met Jonathan Arena and moved in with him after a couple of weeks. Trial Tr. at 792:16. Cartagena told Arena "that she was very depressed, that she took a lot of pills and wanted to kill herself and [then] she laid down in bed with Bianca . . . . [and] the next thing she remembers is waking up and Bianca's dead." Trial Tr. at 820:23–821:19.

Cartagena also gave vague accounts of Bianca's death to three of her friends. Stacia Reeves met Cartagena at work around the year 2000, and they continued to be friends up until the time of Bianca's death. Trial Tr. vol. III at 557:13–15, 565:4–11. Reeves did not reach out to Cartagena after Bianca's death, but received a Facebook message in February 2011 in which Cartagena stated in pertinent part, "I was so messed up when we last hung out and talked. I tried to kill myself after I found Bianca had passed in her sleep." Trial Tr. at 582: 6–8. Cartagena also provided an account to her friend from high school, Jim Banas, who testified that Cartagena told him, "her and Bianca were alone at the home, they laid down to take a nap, she got up a little while later to go into the kitchen to make dinner, and a little while later she went in to check on Bianca because she usually doesn't nap that long and she found her cold in bed . . . then went out to the shed and took a bunch of pills to try to kill herself . . . ." Trial Tr. vol. IV at 694. Another of Cartagena's high school friends, Torian Henley, testified that Cartagena told her that "she remembers telling Bianca that they were going to take a nap but she doesn't remember anything else and because she took like all the medication that was in her house." Trial Tr. at 709:18–21.

Lastly, Cartagena gave ambiguous accounts of Bianca's death to her family, as well. In particular, Cartagena's sister, Casie Lamarca, testified that in a series of text messages and emails

after Cartagena's release from ECMC, she consistently wrote that she didn't remember anything from that night. Trial Tr. at 758:22–760:2. Then, on March 26, 2011, Lamarca received an email in which Cartagena wrote, in pertinent part:

> I also need you to know that I do live with tremendous guilt over what happened to Bianca and will accept responsibility if I am charged with any crime. My lawyer is already aware that I want to surrender if charges are filed . . . . I will never be able to give anyone the answers they want as to what happened as my frame of mind was so emotionally disturbed and erratic along with all the pills I took. I truthfully do not remember much.

Trial Tr. at 762:4–13. This was followed by a meeting between Lamarca and Cartagena at Tim Horton's in May 2011 during which Cartagena again stated she had no memory of how Bianca died, but stated that when she received the autopsy results "she was so relieved . . . to find out there was no trauma and no bruises on Bianca and no marks." Trial Tr. at 770:18–22.

<u>Procedural History</u>

Given the absence of witnesses to any wrongdoing, and the ambiguity and variation in Cartagena's statements to others between December 2010 and May 2013, the key issue at trial was whether the medical opinion evidence showed that Bianca died naturally of a sudden cardiac event caused by a diseased heart (dilated cardiomyopathy), or whether she died of asphyxia at the hands of another. The first medical expert to testify was Dr. Dianne Vertes, the chief medical examiner of Erie County who performed the autopsy on Bianca. Trial Tr. vol. III at 417. Dr. Vertes' opinion was that Bianca did not die of any heart related issues or any other natural causes, but that the mechanism of her death was asphyxia. Trial Tr. at 466:15–22, 471:9–10. Nevertheless, in her initial report issued in March 2011, Dr. Vertes listed the cause of death as undetermined, because she could not be clear whether Bianca's suffocation was a homicide, or whether it was the result of an accidental overlay (i.e., being inadvertently laid upon by a heavier body and unable to escape). Trial Tr. at 471:15–472:4. After reviewing all of the medical evidence and related scientific literature over again, however, and seeking a second opinion from a fellow medical examiner, Dr. Vertes came to

6

the conclusion within a reasonable degree of medical certainty that Bianca died of asphyxia, and that the manner of death was a homicide. Trial Tr. at 478:1–479:11.

The prosecution also called Dr. Kim Collins, a well-regarded forensic pathologist from South Carolina. Trial Tr. vol. VII, 1020:12, July 16, 2014. Dr. Collins' particular interest is pediatric forensic pathology, and at one point in her career she was a director of a laboratory for congenital heart disease in children. Trial Tr. at 1025:8–10. In order to formulate her opinion on Bianca's death, Dr. Collins reviewed nearly her entire medical history. Trial Tr. at 1068:7–1070:2. Having done so, Dr. Collins described Bianca's health prior to her death as "fine"; that is, Dr. Collins opined that Bianca "was a healthy eight-year old girl, had no congenital abnormalities or any acquired disease that would have impeded her in school or in her daily activities." Trial Tr. at 1070:6–9. Accordingly, and based on her examination of the autopsy and the autopsy glass slides, Dr. Collins believed within a reasonable degree of medical certainty that Bianca did not die of natural causes, but by asphyxiation at the hands of another individual. Trial Tr. at 1103.

Cartagena also called a medical expert, Dr. Jonathan Arden, a forensic pathologist who had served as a medical examiner in four jurisdictions over twenty years. Trial Tr. vol. V, 843:1–19, June 30, 2014. Dr. Arden disagreed with the opinion that Bianca died of asphyxiation, and listed several positive indicators that he believed were missing from the evidence, including extensive soft tissue injuries, minimal petechial hemorrhaging, no injuries indicative of a serious struggle, and pallor generalized to the whole face. Trial Tr. at 855–866, 880. Instead, Dr. Arden opined that Bianca experienced a "sudden cardiac death due to her dilated cardiomyopathy." Trial Tr. at 902:1–2. On cross-examination, the prosecution elicited testimony from Dr. Arden that he had formed his opinion, in part, based on his mistaken understanding that Bianca had been found face down on the bed, rather than on her back. Trial Tr. at 1010:10.

In its written Findings of Fact [and] Verdict, the state trial court acknowledged the differing medical opinions, but rejected "the conclusion that Bianca Cartagena, a healthy, active,

7

asymptomatic eight-year old child just happened to die a natural death from a diseased heart on the very same day that her deeply troubled mother, in whose sole company she found herself, chose to take her own life." Findings of Fact [and] Verdict at 23. The trial court stated that "[w]hile the precise mechanism of death whether by compression of the neck or abdomen and/or smothering is not clear, what is clear to this court beyond a reasonable doubt is that Bianca Cartagena died from asphyxiation at the hands of her own mother . . . . [and] that her death was brought about intentionally." *Id.* Therefore, the trial court found Cartagena guilty as charged of murder in the second degree. *Id.* at 24. She was sentenced to an indeterminate term of twenty-five years to life in prison.

Cartagena appealed the trial court's decision, raising four arguments: that the trial court's denial of her motion to suppress her statements to the police violated her constitutional rights; that the verdict was against the weight of the evidence and violated her constitutional rights because it was based upon insufficient proof; that prosecutorial misconduct deprived her of her constitutional rights; and that the sentence was unduly harsh and severe. The appellate court rejected all four of Cartagena's arguments, and unanimously affirmed the trial court. *People v. Cartagena*, 54 N.Y.S.3d 230, 232 (N.Y. App. Div. 2017). The New York Court of Appeals denied Cartagena's application for leave to appeal. *People v. Cartagena*, 86 N.E.3d 566 (N.Y. 2017).

On August 16, 2018, Cartagena filed *pro se* the instant habeas petition, maintaining that she was denied his constitutional rights to due process when the appellate court failed to conduct a weight of the evidence review, that her Fifth Amendment rights were violated when the state trial court permitted testimony regarding statements that she made to and around police officers while she was en route to ECMC and under police supervision at the hospital, and that she received the ineffective assistance of trial counsel. Respondent opposes the petition. Resp. Mem. of Law., Nov. 19, 2018, ECF No. 5.

LEGAL STANDARD

Cartagena brings her habeas corpus petition pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well-settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). "Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). For claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)). A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

9

DISCUSSION

As indicated above, Cartagena's habeas application raises three principal arguments. Because Cartagena is proceeding *pro se*, the Court has construed her submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, in accordance with Rule 8 of the Rules Governing Section 2254 Cases, after a review of the answer and the records of the state court proceedings, the Court finds that an evidentiary hearing is not necessary to address Cartagena's application. *See also* 28 U.S.C. § 2254(e)(2).

The Appellate Court's "Weight of the Evidence" Determination

In her appeal of the trial court's judgment to the appellate division of the New York Supreme Court, Cartagena argued that the verdict was against the weight of the evidence, and that she was convicted upon insufficient proof. The appellate court found that "[a]lthough circumstantial in nature, when viewed in the light most favorable to the People, we conclude that the evidence is sufficient to establish that defendant intentionally killed the victim." *People v. Cartagena*, 54 N.Y.S.3d at 231. The appellate court also concluded that the verdict was not against the weight of the evidence, stating:

> Viewing the evidence in light of the elements of the crime in this nonjury trial (*see People v. Danielson*, 9 N.Y.3d 342, 349, 849 N.Y.S.2d 480, 880 N.E.2d 1), we conclude that the verdict is not against the weight of the evidence (*see generally People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672). While "'a finding that defendant did not intend to kill the victim[ ] would not have been unreasonable . . ., it cannot be said that County Court, which saw and heard the witnesses and thus was able to assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record, failed to give the evidence the weight it should be accorded'" (*Badger*, 90 A.D.3d at 1532, 935 N.Y.S.2d 416). The court in this nonjury trial "was free to credit the opinion expressed by the People's expert[s] and reject that of defendant's expert" (*People v. Costa*, 256 A.D.2d 809, 809, 683 N.Y.S.2d 309, *lv. denied* 93 N.Y.2d 872, 689 N.Y.S.2d 434, 711 N.E.2d 648; *see People v. Benson*, 119 A.D.3d 1145, 1148, 990 N.Y.S.2d 321, *lv. denied* 24 N.Y.3d 1118, 3 N.Y.S.3d 759, 27 N.E.3d 473; *People v. Stein*, 306 A.D.2d 943, 944, 762 N.Y.S.2d 201, *lv. denied* 100 N.Y.2d 599, 766 N.Y.S.2d 175, 798 N.E.2d 359, *reconsideration denied* 1 N.Y.3d 581, 775 N.Y.S.2d 797, 807 N.E.2d 910).

*Cartagena*, 54 N.Y.S.3d 230, 231–32 (N.Y. App. Div. 2017).

In her petition before this Court, Cartagena maintains that the appellate division failed to do a proper "weight of the evidence" analysis, and thereby violated her constitutional due process rights. Pet. at 16–17. The Court finds no merit in Cartagena's argument.

To begin with, Cartagena appears to argue[1] that the appellate division conducted only a test of legal sufficiency focused on the elements of the crime, and not a test of the facts as required for a weight of the evidence analysis under New York Criminal Procedure Law § 470.15(5). Cartagena's argument, however, overlooks the appellate division's citation to the New York Court of Appeals case of *People v. Danielson*, 880 N.E.2d 1 (N.Y. 2007). In *Danielson*, New York's highest court contemplated the appellate division's role as a "thirteenth juror" when conducting weight of the evidence analysis, and stated that "[n]ecessarily, in conducting its weight of the evidence review, a court must consider the elements of the crime, for even if the prosecution's witnesses were credible their testimony must prove the elements of the crime beyond a reasonable doubt." *Id.* at 5. The appellate court's consideration of the evidence against Cartagena in light of the elements of murder in the second degree, then, was appropriate.

Furthermore, the appellate division acknowledged the circumstantial nature of the evidence and the importance of the trial court's credibility determinations, and expressly stated that "it cannot be said that [the trial court] . . . failed to give the evidence the weight it should be accorded." *Cartagena*, 54 N.Y.S.3d at 231 (quoting *People v. Badger*, 935 N.Y.S.2d 416 (N.Y. App. Div. 2011)). Then, the appellate division squarely considered the central factual issue in the case: the cause of Bianca's death. Acknowledging the differences of opinion between the medical experts offered by both sides, the appellate division rightly noted that the trial court was free to credit the people's expert and reject the defendant's expert, and declined to find that the trial court's conclusion was against the weight of the evidence. *Id.* at 232.

---

[1] Cartagena's argument in this regard is difficult to follow. However, she seems to give great import to the appellate court's statement that "[v]iewing the evidence in light of the elements of the crime in this nonjury trial . . . we conclude the verdict is not against the weight of the evidence." *Cartagena*, 54 N.Y.S.3d at 231.

Cartagena's Statements to Law Enforcement

Cartagena also claims that she was denied her constitutional rights under the Fifth Amendment when the trial court allowed law enforcement to testify about statements she made to them while en route to the hospital from her home on the date of Bianca's death, or while hospitalized. In particular, in a pretrial motion Cartagena sought to suppress statements she made to Officer Doldan and Detective Solak on the grounds that she was in custody pursuant to Mental Health Law § 9.41 and had not been advised of her Miranda rights. After a Huntley Hearing, the trial court considered the totality of the circumstances and concluded that:

> Although the police were with the defendant at the hospital for a long time, neither their continued presence nor manner of questioning created the type of custodial environment that would have led a reasonable, innocent person to believe that she was, for all intents and purposes, subject to a de facto arrest.

Dec. and Order, 13, Nov. 26, 2013. Cartagena challenged the trial court's ruling on direct appeal, and the appellate division held that the trial court did not err in refusing to suppress the statements Cartagena made to Officer Doldan and Detective Solak because she was not in custody when she made the statements. *Cartagena*, 54 N.Y.S.3d at 232.

The test regarding the suppression of custodial statements is clear in the Second Circuit:

> Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) . . . .

> "'[C]ustody' for Miranda purposes is not coterminous with ... the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152–53 (2d Cir. 2011). In determining whether a suspect was in custody, a court looks at all the surrounding circumstances. The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Although both elements are required, the second is the "ultimate inquiry" because a "free–to–leave inquiry reveals only whether the person questioned was seized."

*Newton*, 369 F.3d at 672 (internal quotation omitted). Not all seizures amount to "custody"; a seizure is a necessary, but not sufficient, condition. *Id*.

* * *

An individual who understands that her detention is "not likely to be temporary and brief" and feels that she is "completely at the mercy of police" could reasonably deem her situation comparable to formal arrest. *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 437–38). Relevant considerations include: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (internal citations and alterations omitted).

*United States v. Faux*, 828 F.3d 130, 134–35 (2d Cir. 2016).

The trial court's decision not to suppress Cartagena's statements to Officer Doldan and Detective Solak was not contrary to, and did not involve an unreasonable application of, clearly established Federal law. Even if Cartagena had believed that she was not free to leave the police encounter at issue, no reasonable person would have deemed her situation with respect to either Officer Doldan or Detective Solak was comparable to formal arrest. Officer Doldan testified that he sought mainly pedigree information from Cartagena so that he could complete his police report at the end of the shift. Trial Tr. at 290:16–23. He asked for such identifying information as her name, date of birth, and address, and also was trying to ascertain why she tried to kill herself. Trial Tr. 301:17–18. At the Huntley Hearing, Officer Doldan stated that he did not threaten or coerce Cartagena in any way, that she did not express discomfort in answering any of his questions, did not appear upset, and did not ask for an attorney. Huntley Hr'g Tr., 27:10–28:11, Sept. 20, 2013. He also testified that Cartagena was not handcuffed or restrained in any way, did not express a desire to leave, and did not refuse any of the medical treatment she was receiving from the various medical personnel that were in and out of her room. Huntley Hr'g Tr. at 18:10–20, 46:12–18.

Detective Solak testified that he joined Officer Doldan in Cartagena's room at the hospital on the evening of November 30. Huntley Hr'g Tr. at 59:7–15. Detective Solak also testified that Cartagena was not handcuffed or restrained, and he stated that she was not a suspect in a crime at that point. *Id.* at 59:16–22. The conversation that Detective Solak had with Cartagena "was basically what I would consider just smalltalk [sic], pedigree information as to why she was there and what happened leading up to that." *Id.* at 60:23–61:2. She was cooperative, did not indicate that she did not want to talk, did not request an attorney, and did not appear upset or distraught at having been spoken to. *Id.* at 62:21–63:23.

Given the totality of the circumstances, the trial court's decision not to suppress Cartagena's respective statements to Officer Doldan and Detective Solak was not contrary to, or an unreasonable application of, clearly established federal law.

Ineffective Assistance of Counsel

Lastly, Cartagena maintains that she was deprived of her constitutional right to counsel when her trial counsel failed to preserve a challenge to the legal sufficiency of the evidence. The Sixth Amendment guarantees a criminal defendant the right to "reasonably effective assistance" of counsel. To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" under the "prevailing professional norms." *Vadas v. U.S.*, 527 F.3d 16, 20 (2d Cir. 2007) (citing *Strickland*, 466 U.S. at 688). Second, the defendant must demonstrate he was prejudiced by the ineffective conduct. *Strickland* at 687–88. A defendant's failure to satisfy one prong of this two-pronged test relieves the court of any requirement to consider the other prong. *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991).

14

In the present case, the Court need not consider whether Cartagena's attorney's performance fell below an objective standard of reasonableness because Cartagena fails to show prejudice. To demonstrate prejudice, the habeas petitioner must show there is a "reasonable probability" that but for counsel's error, the outcome of the proceeding would have been different. *Strickland* at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome . . . instead, [t]he likelihood of a different result must be substantial, not just conceivable." *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) (quoting *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011)) (internal quotation marks omitted).

Cartagena's claim that she was prejudiced by her attorneys' failure to preserve her challenge to the legal sufficiency of the evidence for appeal is without merit. Whether or not Cartagena's attorney preserved the issue for appellate review, it is clear that the appellate division did consider the issue, and "conclude[d] that the evidence is sufficient to establish that defendant intentionally killed the victim." *Cartagena*, 54 N.Y.S.3d at 231. Further, with respect to other facets of Cartagena's case, the record shows that her trial attorney vigorously contested the prosecution's case and provided an able defense.

Consequently, Cartagena's claim of ineffective assistance of counsel must be denied.

CONCLUSION

Based on the foregoing, it is hereby ORDERED that Cartagena' application for habeas relief [ECF No. 1] is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Cartagena has not made a substantial showing of the denial of a constitutional right.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second

Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

Dated:      July 27, 2021
            Rochester, New York

ENTER:

CHARLES J. SIRAGUSA
United States District Judge